IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOSHUA LATHAM,<br><br>　　　　　　　Petitioner,<br><br>vs.<br><br>B. GOWER, Warden, California<br>Correctional Center,[1]<br><br>　　　　　　　Respondent. | No. 2:12-cv-01932-JKS<br><br>MEMORANDUM DECISION |

Joshua Latham, a state prisoner proceeding *pro se*, filed a Petition for a Writ of Habeas Corpus with this Court pursuant to 28 U.S.C. § 2254.  Latham is in the custody of the California Department of Corrections and Rehabilitation and incarcerated at the California Correctional Center in Susanville, California.  Respondent has answered, and Latham has replied.

## I.  BACKGROUND/PRIOR PROCEEDINGS

On August 21, 2007, Latham and co-defendant Kyle Vigil were charged with two counts of shooting at an inhabited dwelling (counts 1 and 2) and one count of participating in a criminal street gang (count 3).  The information also alleged as to counts 1 and 2 that the crimes were committed for the benefit of, or at the direction of, a criminal street gang.  Upon direct appeal of his conviction, the California Court of Appeal summarized the following facts underlying the charges against Latham:

> *The Shootings*
> 　　　In the late night hours of June 21, 2007, gunshots were fired at two separate residences in Woodland.  A witness who lived at 1309 Donnelly Circle saw a white car pass by and heard slurs against the Sureño street gang, followed by gunshots.

---

[1]　　B. Gower, Warden, California Correctional Center, is substituted for T. Virga, former Warden, California State Prison, Sacramento.  FED. R. CIV. P. 25(c).

Subsequently, a bullet was found lodged in a rooftop air conditioner of the witness's apartment building and thirteen .30-caliber shell casings were discovered nearby.

Gunshots were also fired at a house located at 1656 Santoni Lane, where a reputed Sureño gang member resided. Officers discovered seven bullet holes in the walls of the residence. Spray-painted graffiti denigrating a Sureño gang "subset" was discovered in front of the house.

*Victor Chaney's Testimony*

Victor Chaney was the star witness for the prosecution. Chaney testified that he was a longtime friend of defendants Latham and Vigil, having grown up with them in the same apartment complex in Woodland.

Chaney testified that he and Vigil attended a party at Latham's house on the night in question. After two or three hours of socializing and drinking alcohol Chaney, Latham, Vigil and someone known only as "Chase" went upstairs to Latham's room. Once in the room, the individuals in the group continued to drink alcohol and smoked marijuana. Chaney was "buzzing" from the alcohol. He believed each person drank about the same amount.

At one point, Chaney noticed a rifle inside Latham's closet. Latham took the gun out, brandished it and bragged that he had used it "unlawfully." Chaney took photos of Latham posing with the rifle and "showing it off." Latham made a comment to the effect that he was "ready for war."

Chaney, Latham, Vigil and Chase then walked out of the apartment building together, with Latham carrying the rifle over his shoulder. The group headed towards Latham's car, which was parked outside. When they got to the car, Latham threw Vigil the car keys.

The foursome got into the car. Vigil was the driver, while Latham occupied the passenger seat. Chaney and Chase sat in the back. Before they departed, Latham announced that anyone who was "scared to go to prison" should get out of the car. No one moved.

The group went to the Yolano neighborhood, where Vigil drove into a parking lot. After Vigil stopped the car, Latham got out and discharged five or six rounds from the rifle. Latham appeared to be pointing the gun toward the houses or duplexes, but at an angle "like up in the sky." When he was finished, Latham got back in the car and they drove toward the Bel Air neighborhood. At this point, Chaney caught a glimpse of Vigil's face in the rear-view mirror. Vigil "looked remorseful."

When they arrived in the Bel Air neighborhood, Vigil drove by a certain house and Latham opened fire out of the open passenger window. On this occasion, Latham was shooting "at the house." At the time of the shooting, the car was traveling about five to 10 miles per hour. Chaney put his head down after the first shot, because he knew "we were . . . doing a drive-by." Following the second shooting, Vigil drove back to their apartment complex. Latham put the rifle in the trunk and the group went back to Latham's apartment and smoked some marijuana. About 30 to 35 minutes later, the four went back to the car and were prepared to go out again, when they were stopped by Chaney's father.

There is no indication in the record that Chaney was charged with any crime or that he was offered any special treatment in exchange for his testimony. Chaney stated that he came clean to the police solely because he found out his dad was dying of cancer and he wanted to "be there for him." He denied that anyone intimidated or threatened him, or tried to prevent him from testifying.

Chaney denied that there was any discussion that evening about gangs, a specific objective or a destination during the entire adventure. He did not know how or why the house in the Bel Air district was targeted, although he was aware that the Yolano neighborhood was a reputed gang area occupied by "Southerners."

*Gang Evidence*

Detective Ronald Cordova of the Woodland Police Department testified as an expert in criminal street gangs, with special emphasis on Nuestra Familia and the Norteño gang. Cordova had previously been qualified as an expert on both Norteño and Sureño gangs, having spoken to more than 300 Norteño and 100 Sureño gang members, and written at least 25 gang-related search warrants.

Detective Cordova testified that the Norteño and Sureño gangs have been around since the 1960's and are natural rivals. In Woodland, as elsewhere, these gangs have divided up territory, with the Norteños occupying the north and Sureños the south part of the region. The Norteños are a validated street gang.

Gang members show their affiliation by colors, letters, numbers, tattoos and music. They also have monikers and use hand signs and graffiti on their personal belongings. There are about 350 validated Norteño gang members in the Woodland area. There are also "associates" who hang around gang members and "veteranos," who are inactive themselves, but mentor younger gang members.

Gang members use fear and intimidation to generate respect from rival gangs and within the community. In the Norteño culture, no act of disrespect can go unanswered. The primary activities of the Norteños include assaults with deadly weapons, drug dealing, burglaries, and drive-by shootings. Detective Cordova described the factual settings in which Woodland Norteño gang members were convicted of felonies with gang enhancements.

Detective Cordova recounted that several items seized at Vigil's apartment included gang paraphernalia, writings, pictures, and graffiti. In Cordova's opinion, these items were indicative of Vigil's association with the Norteño street gang. In addition, a scrolled kite found in Vigil's possession while in jail contained information that indicated he had been in contact with a member of Nuestra Familia, which is the governing body of the Norteños.

Detective Cordova also opined that Latham was a validated member of the Norteño gang. Images seized from Latham's computer were indicative of gang affiliation and three rap CD's (Compact Discs) found in Latham's residence were further indicia of gang membership. Officers also found a red baseball cap in Latham's residence with an "N" logo, which is a symbol of the Norteños.

It was Detective Cordova's opinion that the shootings at Donnelly Circle and Santoni Lane were both committed for the benefit of the Norteño gang.

*People v. Vigil*, 120 Cal. Rptr. 3d 643, 645-47 (Cal. Ct. App. Jan. 24, 2011).

On August 25, 2008, Latham and Vigil proceeded to jury trial.  At the conclusion of trial roughly a month later, the jury found Latham guilty of shooting at an inhabited dwelling as charged in count 2 (the Santoni Lane shooting).  While it found Latham not guilty as to shooting at an inhabited dwelling as charged in count 1 (the Donnelly Circle shooting), it convicted him of discharging a firearm in a grossly negligent manner as a lesser included offense of that count. It found Latham not guilty of participating in a criminal street gang as alleged in count 3 but found true the two criminal street gang allegations attached to counts 1 and 2.[2]  After denying his motion for a new trial, the trial court sentenced Latham to the middle term of 2 years, plus an additional 5 years for the street gang enhancement, on count 1 and an indeterminate term of 15 years to life on count 2 for an aggregate state prison term of 22 years to life.[3]

Both Latham and Vigil appealed their convictions.  Through counsel, Latham argued that the true findings on the gang enhancements must be vacated because there was insufficient evidence that the Norteños consistently and repeatedly engaged in the primary activities necessary to constitute a criminal street gang.  He also joined in all claims raised in Vigil's appellate brief.  In a counseled brief, Vigil argued that: 1) a juror committed prejudicial misconduct that warranted reversal of his conviction; 2) there was insufficient evidence to corroborate Chaney's accomplice testimony; 3) there was insufficient evidence to support the

---

[2]     The jury found Vigil not guilty as to count 1, the lesser included offense of count 1, and count 3.  The jury found Vigil guilty of count 2 and found true the criminal street gang enhancement as it related to count 2.

[3]     The court also denied Vigil's motion for a new trial and sentenced him on count 2 to an indeterminate term of 15 years to life.

primary activities element of the gang enhancement; and 4) the true finding on the gang enhancement was inconsistent with the jury's finding that Vigil and Latham were not guilty of active membership in a street gang.

On January 24, 2011, the Court of Appeal reversed the judgment of conviction against Vigil in a reasoned, partially-published opinion concluding that the misconduct of Juror No. 2, who had conducted an experiment outside the courtroom based on evidence presented at trial, raised a presumption of prejudice which had not been rebutted. *Vigil*, 120 Cal. Rptr. at 654. The Court affirmed the judgment against Latham, however, holding that, although Latham joined in the juror misconduct claim, he was not entitled to reversal because it was "self-evident that the juror misconduct . . . affected only Vigil's conviction." *Id*. at n.6. The court additionally made clerical corrections to Latham's abstract of judgment which are not relevant here. *Id*. at 654. In the unpublished portion of the opinion, the appellate court rejected the accomplice corroboration claim on the basis that the jury impliedly found that Chaney was not an accomplice. The court likewise concluded that the gang expert's testimony at trial adequately supported the primary activities element of the gang enhancement and their acquittal on the substantive gang offense was not fatally inconsistent with the true findings on the gang enhancements because they each contained different elements.

Latham petitioned the California Supreme Court for review, raising the claims that were unsuccessful in the Court of Appeal and additionally asserting that he was entitled to the same relief as Vigil on the juror misconduct claim and that appellate counsel was ineffective for failing to secure that relief. The Supreme Court summarily denied the petition for review on April 27, 2011.

On July 18, 2012, Latham timely filed a *pro se* Petition for a Writ of Habeas Corpus to this Court.  On the same day, he filed a habeas petition in the California Supreme Court in which he re-asserted his ineffective assistance of appellate counsel claim.  The Supreme Court denied his state habeas petition on October 24, 2012, with citations to *In re Waltreus*, 397 P.2d 1001, 1005 (Cal. 1965) (barring relitigation on habeas of claims previously raised and rejected on direct appeal) and *In re Dixon*, 264 P.2d 513, 514 (Cal. 1953) (holding that habeas relief is unavailable if "the claimed errors could have been, but were not, raised upon a timely appeal from a judgment of conviction").

## II. GROUNDS/CLAIMS

In his *pro se* Petition, Latham raises four grounds for relief.  First, he argues that the true finding on the gang enhancement is fatally inconsistent with the jury's finding that Vigil and Latham were not guilty of active membership in a street gang.  He next asserts that there was insufficient evidence to support the primary activities element of the gang enhancements.  Third, Latham contends that he also is entitled to a new trial based on the juror misconduct.  Finally, he relatedly argues that his appellate counsel was ineffective because his co-appellant was granted a new trial because of juror misconduct while his conviction was affirmed.  With respect to his first ground, Latham requests a stay and abeyance.  Latham also requests an evidentiary hearing as to all claims.

III.  STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C.

§ 2254(d), this Court cannot grant relief unless the decision of the state court was "contrary to, or

involved an unreasonable application of, clearly established Federal law, as determined by the

Supreme Court of the United States," § 2254(d)(1), or "was based on an unreasonable

determination of the facts in light of the evidence presented in the State court proceeding,"

§ 2254(d)(2).  A state-court decision is contrary to federal law if the state court applies a rule that

contradicts controlling Supreme Court authority or "if the state court confronts a set of facts that

are materially indistinguishable from a decision" of the Supreme Court, but nevertheless arrives

at a different result.  *Williams v. Taylor*, 529 U.S. 362, 406 (2000).

The Supreme Court has explained that "clearly established Federal law" in § 2254(d)(1)

"refers to the holdings, as opposed to the dicta, of [the Supreme Court] as of the time of the

relevant state-court decision."  *Id.* at 412.  The holding must also be intended to be binding upon

the states; that is, the decision must be based upon constitutional grounds, not on the supervisory

power of the Supreme Court over federal courts.  *Early v. Packer*, 537 U.S. 3, 10 (2002).  Where

holdings of the Supreme Court regarding the issue presented on habeas review are lacking, "it

cannot be said that the state court 'unreasonabl[y] appli[ed] clearly established Federal law.'"

*Carey v. Musladin*, 549 U.S. 70, 77 (2006) (citation omitted).

To the extent that the Petition raises issues of the proper application of state law, they are

beyond the purview of this Court in a federal habeas proceeding.  *See Swarthout v. Cooke*, 131 S.

Ct. 859, 863 (2011) (per curiam) (holding that it is of no federal concern whether state law was

correctly applied).  It is a fundamental precept of dual federalism that the states possess primary

authority for defining and enforcing the criminal law. *See, e.g.*, *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (a federal habeas court cannot reexamine a state court's interpretation and application of state law); *Walton v. Arizona,* 497 U.S. 639, 653 (1990) (presuming that the state court knew and correctly applied state law), *overruled on other grounds by Ring v. Arizona*, 536 U.S. 584 (2002).

In applying these standards on habeas review, this Court reviews the "last reasoned decision" by the state court. *See Robinson v. Ignacio,* 360 F.3d 1044, 1055 (9th Cir. 2004) (citing *Avila v. Galaza*, 297 F.3d 911, 918 (9th Cir. 2002)). Under the AEDPA, the state court's findings of fact are presumed to be correct unless the petitioner rebuts this presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

## IV. DISCUSSION

### Claim 1. Inconsistent Jury Verdicts

Latham first argues that the jury's true finding on the gang enhancement is fatally inconsistent with its finding that Vigil and Latham were not guilty of active membership in a street gang. Latham contends that this fatal factual inconsistency in the jury's verdicts violates the Fifth and Fourteenth Amendments to the United States Constitution.

Preliminarily, Latham's Petition indicates that he requests a stay and abeyance with respect to this claim. A district court has discretion to stay a petition which it may validly consider on the merits once a petitioner has exhausted his remedies in state court. *Rhines v. Weber*, 544 U.S. 269, 276 (2005). A stay and abeyance, however, is available only in limited circumstances. First, there must be good cause for the petitioner's failure to exhaust his claims

8

first in the state courts. *Id.* at 277.  Second, even if cause is shown, a district court would abuse

its discretion if it were to grant a stay as to unexhausted claims that are plainly meritless.  *Id.*

Latham does not explain in his Petition why he requests to stay the proceedings.  The

record indicates that, on the day Latham filed the instant Petition, he concurrently filed in the

California Supreme Court a petition for a writ of habeas corpus.  The record further indicates

that the Supreme Court denied his state habeas petition on October 24, 2012.  It therefore

appears that a stay is unnecessary as his state court proceedings appear to have been resolved.

Moreover, Latham fails to satisfy the second prong enumerated above.  For the reasons

that follow, Latham's claim is without merit and thus does not warrant the stay and abeyance

that Latham seeks.

The Court of Appeal rejected Latham's inconsistent verdict claim as follows:

> The "gang benefit" enhancement of section 186.22(b) (1) and the substantive
> crime of active participation in a street gang as set forth in section 186.22(a) contain
> different elements.
> The substantive crime requires that the defendant (1) actively participate in a
> criminal street gang; (2) have knowledge that its members engage in a pattern of criminal
> gang activity; and (3) willfully promote, further, or assist any felonious conduct by
> members of that gang. (§ 186.22 (a).)  The gravamen of the crime is "'*participation in
> the gang itself.*'"  (*People v. Martinez* (2008) 158 Cal. App. 4th 1324, 1334.)
> The enhancement, on the other hand, does not require that the actor be an active
> gang member.  All that is required to satisfy the enhancement is that the accused commit
> a charged crime "for the benefit of, at the direction of, or in association with any criminal
> street gang," with the specific intent to promote, further, *or* assist criminal conduct by
> gang members. (§ 186. 22 (b) (1), italics added.)
> Logic dictates that one can commit a crime with the intent to further gang activity
> without himself being an active member of a street gang.  A crime committed by a gang
> "wannabe," who is not yet a full-fledged member but wants to impress gang leaders by
> committing a crime that furthers the gang's purposes and philosophy, would be a classic
> example of an offense that would satisfy the section 186.22(b) (1) enhancement, without
> necessarily embracing the elements of the substantive crime of section 186.22(a).
> In any event, even a factual inconsistency between the jury's enhancement
> finding and a related substantive offense does not warrant reversal, as long as the guilty
> verdict is supported by substantial evidence.  "[A]s a general rule, inherently inconsistent

verdicts are allowed to stand." (*People v. Lewis* (2001) 25 Cal. 4th 610, 656.) "Section 954 provides that '[a]n acquittal of one or more counts shall not be deemed an acquittal of any other count.' Thus, a jury may properly return inconsistent verdicts on separate counts." (*People v. York* (1992) 11 Cal. App. 4th 1506, 1510.) Section 954 is not limited to inconsistencies between "counts"—it has also been applied to uphold inconsistent enhancement findings. (*People v. Brown* (1989) 212 Cal. App. 3d 1409, 1421, disapproved on different grounds in *People v. Hayes* (1990) 52 Cal.3d 577, 628, fn.10; *People v. Lopez* (1982) 131 Cal. App. 3d 565, 569-571.) "The concept of jury largesse is not governed by the legislative choice of language. The fact that the word 'enhancement' is used rather than 'offense' does not nullify the underlying rationale of refusing to invalidate an inconsistent jury verdict if it is otherwise supported by substantial evidence." (*People v. Lopez, supra,* 131 Cal. App. 3d at p. 571.) "When a jury renders inconsistent verdicts, 'it is unclear whose ox has been gored.' [Citation.] The jury may have been convinced of guilt but arrived at an inconsistent acquittal or not true finding 'through mistake, compromise, or lenity . . .'" (*People v. Santamaria* (1994) 8 Cal.4th 903, 911, quoting *United States v. Powell* (1984) 469 U.S. 57, 65 [83 L.Ed.2d 461, 469].) "In other words, if the conviction is supported by substantial evidence, it is valid because the defendant 'had the benefit of the jury's compassion, rather than suffering a burden because of its passion . . . ." (*People v. Pahl* (1991) 226 Cal. App. 3d 1651, 1656.) As stated in *People v. Amick* (1942) 20 Cal.2d 247, at page 252, "such inconsistent verdicts may be caused not by the confusion but the mercy of the jury, of which the appellant can neither complain nor gain further advantage."

Since there is no claim the enhancement finding was not supported by substantial evidence, any inconsistency between that finding and an acquittal of the offense of active gang membership presents no cause for reversal.

The appellate court's holding fully comports with federal law, under which "it is well-established that inconsistent verdicts may stand, even when a conviction is rationally incompatible with an acquittal, provided there is sufficient evidence to support a guilty verdict." *United States v. Suarez*, 682 F.3d 1214, 1218 (9th Cir. 2012) (citation, internal quotation marks and bracketing omitted). As discussed in more detail with regard to claim 2, the true finding was adequately supported by legally sufficient evidence. Thus, while the jury's true finding on the gang enhancement may seem somewhat logically inconsistent with the jury's acquittal on the gang participation charge, that alleged inconsistency is not grounds for habeas review because

substantial evidence supports the jury's verdict.  Accordingly, Latham is not entitled to relief on

this claim nor is he entitled to a stay and abeyance to further pursue it in the state courts.

Claim 2. Insufficiency of the Evidence

A "criminal street gang" means "any ongoing organization, association, or group of three

or more persons, whether formal or informal, having as one of its primary activities the

commission of one or more of the criminal acts enumerated in paragraphs (1) to (25), inclusive,

or (31) to (33), inclusive, of subdivision (e), having a common name or common identifying sign

or symbol, and whose members individually or collectively engage in or have engaged in a

pattern of criminal gang activity."  CAL. PENAL CODE § 186.22(f).  Latham argues in claim 2 that

the gang enhancement findings must be reversed for insufficient proof because there is

insufficient evidence that any of the offenses enumerated in the gang statute constituted one of

the Norteño gang's "primary activities."

As articulated by the Supreme Court in *Jackson*, the federal constitutional standard for

sufficiency of the evidence is whether, "after viewing the evidence in the light most favorable to

the prosecution, *any* rational trier of fact could have found the essential elements of the crime

beyond a reasonable doubt."  *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in the

original); *see McDaniel v. Brown*, 558 U.S. 120, 132-33 (2010) (reaffirming this standard).  This

Court must therefore determine whether the California court unreasonably applied *Jackson*.  In

making this determination, this Court may not usurp the role of the finder of fact by considering

how it would have resolved any conflicts in the evidence, made the inferences, or considered the

evidence at trial.  *Jackson*, 443 U.S. at 318-19.  Rather, when "faced with a record of historical

facts that supports conflicting inferences," this Court "must presume–even if it does not

affirmatively appear in the record–that the trier of fact resolved any such conflicts in favor of the prosecution, and defer to that resolution." *Id.* at 326.

It is a fundamental precept of dual federalism that the States possess primary authority for defining and enforcing the criminal law. *See Engle v. Isaac*, 456 U.S. 107, 128 (1982). Consequently, although the sufficiency of the evidence review by this Court is grounded in the Fourteenth Amendment, it must take its inquiry by reference to the elements of the crime as set forth in state law. *Jackson*, 443 U.S. at 324 n.16. A fundamental principle of our federal system is "that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus." *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005); *see West v. AT&T*, 311 U.S. 223, 236 (1940) ("[T]he highest court of the state is the final arbiter of what is state law. When it has spoken, its pronouncement is to be accepted by federal courts as defining state law . . . ."). "Federal courts hold no supervisory authority over state judicial proceedings and may intervene only to correct wrongs of constitutional dimension." *Sanchez-Llamas v. Oregon*, 548 U.S. 331, 345 (2006) (quoting *Smith v. Philips*, 455 U.S. 209, 221 (1982)) (internal quotation marks omitted). It is through this lens that this Court must view an insufficiency of the evidence claim.

As aforementioned, the gang enhancement statute enumerates a number of offenses which may be used to establish a "pattern of criminal gang activity" that is "one of its primary activities." *See* CAL. PENAL CODE § 186.22(f). These offenses include assaults with firearms, homicides, drug dealing, drive-by shootings, and burglaries. *Id.* In this case, the prosecution relied on Detective Cordova's testimony that the commission of those included offenses is one of the gang's primary activities, finding it "soundly based on his extensive training and expertise in

Hispanic gangs, and specifically on the Norteño gang in the Woodland area."  The appellate

court observed that Detective Cordova had attended law enforcement conferences on street

gangs and had personally investigated more than 30 gang cases.  Detective Cordova also testified

about the convictions of validated Norteño members for the enumerated offenses, which was

supported by certified copies of court records evidencing the convictions.

California law provides that the prosecution may rely on a properly qualified gang

expert's testimony or "evidence that the group's members *consistently and repeatedly* have

committed criminal activity listed in the gang statute" to establish the primary activities element.

*People v. Sengpadychith*, 27 P.3d 739, 744 (Cal. 2001).  As the appellate court noted, Latham

did not challenge Detective Cordova's qualifications as an expert on direct appeal, nor does he

challenge them in the instant Petition.  Nor does he challenge the accuracy of the documented

evidence of other members' convictions.  Accordingly, a rational factfinder could easily draw

from Detective Cordova's testimony and the documented evidence of other convictions the

inference that one of the Norteño gang's "primary activities" is the commission of predicate

offenses.  CAL. PENAL CODE § 186.22(f).  Latham is therefore not entitled to relief on his

insufficiency of the evidence claim.

Claim 3. Juror Misconduct

Latham next contends that he is entitled to the same relief as Vigil for prejudicial juror

misconduct.  On direct appeal, the Court of Appeal laid out the following facts surrounding

Vigil's juror misconduct claim:

> Prior to trial, the trial judge instructed the jury: "Don't do any research on your
> own, and don't do any research as a group.  You're not to use a dictionary or other
> reference materials.  You're not to investigate the facts or the law.  *Don't conduct any*

13

*tests or experiments.*  Don't go visit the scene of any event involved in this case."  (Italics added.)

After the verdict, Vigil moved for a new trial based on juror misconduct.  Vigil's counsel, Jeff Raven, filed a declaration stating that, at the conclusion of the trial, he asked Juror No. 2 why, if the jury acquitted his client of count 1 (the Donnelly Circle shooting), they found him guilty on the second count (the drive-by shooting at Santoni Lane).  In other words, if the jurors found Vigil did not know that Latham was going to do the first shooting, "why would you impart [sic] knowledge to him on the second shooting?"  Juror No. 2 answered, in substance, "Mr. Raven, do you know how difficult it is to raise a rifle out of the window from the passenger seat?  You would have to maneuver like this, turn this way, move back a foot or two.  Its [sic] not easy.  It takes time.  And *I know, I did it with a broomstick.*"  (Italics added.)

Juror No. 10 provided an affidavit stating that "[d]uring jury deliberations, when it was his turn to speak, a juror that I don't recall his name, but was a teacher, told jury members that he had conducted an experiment at home where he sat in his car as a passenger and had a broomstick, pretending he was shooting at a house.  The juror said that after his experiment, he felt that one of the shootings was intentional and deliberate."

Juror No. 11 submitted an affidavit stating that Juror No. 2 told the jury about the results of an experiment he had done at home "to determine if Joshua Latham can with his right hand, lower the car window and quickly stick the rifle out."  Juror No. 2 said he tried the experiment using a broomstick both right-handed and left-handed.  He felt that if the shooter was right-handed, it would be a lot less difficult than if he was left-handed.  The remarks were made toward the end of deliberations, when the jury was unable to come up with a unanimous vote.

Vigil also presented the affidavit of defense investigator James Peoples.  Peoples averred that the following statements were made to him by Juror No. 2: (1) he conducted an experiment to see how difficult it would be for a right-handed person to "poke" a gun out of a passenger window of a car; (2) during deliberations, he "probably" said something to the effect that it was "unlikely that the driver [Vigil] wouldn't be aware that [Latham] was going to shoot a rifle because [Latham] would have to jack around inside the car with the gun"; and (3) that he "probably" also told the jurors, "I tried it with a broom[;] I don't think you can do it."  (Italics omitted.)  While Juror No. 2 initially agreed to sign an affidavit, he subsequently made himself unavailable.

The prosecutor opposed the motion for new trial but did not submit any evidence to controvert the defense affidavits.  Vigil's counsel requested that the court conduct an evidentiary hearing, so that it could have the benefit of Juror No. 2's sworn testimony.

The trial court began the hearing by acknowledging that it had received the affidavits of two jurors, which were "competent evidence" regarding Juror No. 2's statements to his fellow jurors.  Accordingly, the court accepted the truth of the allegations that Juror No. 2 had made the subject comments, just as if Juror No. 2 had signed an affidavit acknowledging them.

The trial judge also found that in performing the broomstick experiment, Juror No. 2 committed misconduct.[FN2]

FN2.  The court's exact words were: "Should the juror have done it?  No.  That's an easy one.  This is not the type of thing that if the juror had asked ahead of time, Judge, do you mind if I do this when I go home tonight that I would have said yes.  I would have said, no, you cannot.  You're told not to do those types of things.  [¶]  But the question is whether it is so unusual that it becomes prejudicial, and based on all of the evidence in the case, it cannot be seen to be unusual and prejudicial in that sense."

Nevertheless, the court found that the experiment was not "so unusual" as to be prejudicial under the facts of the case.  The trial judge reasoned that the subject matter of the experiment was a matter of such "common experience that people could talk about it rationally and reasonably.  It's not something that is completely without common experience."  Second, the court found the evidence that Vigil knew Latham would shoot the rifle out of the car during the Santoni Lane shooting so "overwhelming" that the misconduct "[did] not interfer[e] with the jury's work on that."  Accordingly, the motion for new trial was denied.

*Vigil*, 120 Cal. Rptr. 3d at 648-49.

The Court of Appeal subsequently concluded that the misconduct was prejudicial:

The jurors obviously struggled with the issue of Vigil's liability as an accomplice to the Santoni Lane shooting.  They acquitted him entirely of the first shooting, and thus entertained a reasonable doubt that he knew Latham would get out of the car and open fire at Donnelly Circle.  The affidavits establish that the jurors were, at some point, unable to agree on a verdict and that Vigil's culpability for the second shooting consumed most of their deliberations.  The jury made several requests for clarification from the judge.  It retired to begin deliberations just before noon on Thursday, continued its deliberations on Friday, and did not return a verdict until approximately 3:00 p.m. on Monday.

Juror No. 2's report of his experiment could well have had a significant influence on jury deliberations.  The experiment created new evidence outside the courtroom, contradicted an asserted defense and lightened the prosecution's burden of proof on a material issue—whether Vigil knew that Latham was going to commit a drive-by shooting at the Santoni Lane residence.[FN5]  Juror No. 2 was a college professor, thereby enjoying enhanced stature in the eyes of his fellow jurors and lending credence to his conclusions.  His reported experiment could well have struck a decisive blow in favor of conviction by causing one or more jurors to shortcut the deliberative process.  This type of misconduct cannot be deemed harmless.  "'The fact that the experiment was performed by one juror, . . . outside of the court room and the deliberations, is more egregious and resulted in outside influences or extrinsic evidence permeating the jury's deliberations on perhaps the key factual determination in the case.'"  (*Bell* [*v. State of California*, 74 Cal. Rptr. 2d 541, 550 (Cal. Ct. App. 1998)].)

FN5.  The trial court's observation that the evidence overwhelmingly showed Vigil had such knowledge, even if true, does not show lack of prejudice.  Where the jury has been exposed to improper outside influences, the test for prejudice is not the strength of the prosecution's case, but whether the impartiality of the jury has been compromised.  (*See People v. Nesler* (1997) 16 Cal.4th 561, 578-579, 66 Cal. Rptr. 2d 454, 941 P.2d 87.)

The Ninth Circuit Court of Appeals has observed that reversible error for juror misconduct "commonly occurs where there is a direct and rational connection between the extrinsic material and a prejudicial jury conclusion, and where the misconduct relates directly to a material aspect of the case."  (*Marino v. Vasquez* (9th Cir. 1987) 812 F.2d 499, 506, citing *United States v. Bagnariol* (9th Cir. 1981) 665 F.2d 877, 885.)  The misconduct here satisfies both prongs of this test.

We conclude that the presumption of prejudice was not rebutted.  Vigil's conviction must be reversed.

*Vigil*, 120 Cal. Rptr. 3d at 653-54 (footnote omitted).

The Court of Appeal further found no prejudice to Latham.  It noted in a footnote that "[a]lthough Latham purports to join in *all* of Vigil's appellate arguments he is not entitled to a reversal on this ground.  It is self-evident that the juror misconduct we have cited affected only Vigil's conviction."  *Id.* at 654 n.6.  Latham presents no argument in his Petition in support of his contention that he was prejudiced by the juror misconduct.  The unauthorized experiment was intended to resolve only whether the driver (Vigil) would have been aware that the shooter (Latham) was going to shoot at the residence at Santoni Lane.  That experiment thus had no effect on the jury's determination that Latham fired the bullets, and it was undisputed that Vigil—and not Latham—was driving the car.  The Court of Appeal's conclusion that Latham was not prejudiced by the jury misconduct is thus neither unreasonable nor contrary to federal law.  Accordingly, Latham is not entitled to relief on this claim.

Claim 4. Ineffective Assistance of Appellate Counsel

In a related claim, Latham asserts that his appellate counsel was ineffective for failing to secure for him the same relief that Vigil received.  To demonstrate ineffective assistance of counsel under *Strickland v. Washington*, a defendant must show both that his counsel's performance was deficient and that the deficient performance prejudiced his defense.  466 U.S. 668, 687 (1984).  A deficient performance is one in which "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment."  *Id.*

The Supreme Court has explained that, if there is a reasonable probability that the outcome might have been different as a result of a legal error, the defendant has established prejudice and is entitled to relief.  *Lafler v. Cooper*, 132 S. Ct. 1376, 1385-86 (2012); *Glover v. United States*, 531 U.S. 198, 203-04 (2001); *Williams*, 529 U.S. at 393-95.  Where a habeas petition governed by AEDPA alleges ineffective assistance of counsel, the *Strickland* prejudice standard is applied and federal courts do not engage in a separate analysis applying the *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993),[4] standard.  *Avila v. Galaza*, 297 F.3d 911, 918, n.7 (9th Cir. 2002); see *also Musalin v. Lamarque*, 555 F.3d 830, 834 (9th Cir. 2009).  Under this rubric, in reviewing ineffective assistance of counsel claims in a federal habeas proceeding:

> The question "is not whether a federal court believes the state court's determination" under the *Strickland* standard "was incorrect but whether that determination was unreasonable—a substantially higher threshold."  And,

---

[4]     Where the *Brecht* standard of prejudice applies, federal courts apply *Brecht* "'without regard for the state court's harmlessness determination.'"  *Deck v. Jenkins*, 768 F.3d 1015, 1022 (9th Cir. 2014) (quoting *Pulido v. Chrones*, 629 F.3d 1007, 1012 (9th Cir. 2010)).  The *Deck* court explained that "AEDPA deference to the [state court's] harmlessness determination is already subsumed within the *Brecht* standard."  *Id.* at 1024 (citing *Fry v. Pliler*, 551 U.S. 112, 120 (2007)).

> because the *Strickland* standard is a general standard, a state court has even more
> latitude to reasonably determine that a defendant has not satisfied that standard.

*Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (citations omitted); *see also Runningeagle v.*

*Ryan*, 686 F.3d 758, 775 (9th Cir. 2012).

Thus, Latham must show that defense counsel's representation was not within the range

of competence demanded of attorneys in criminal cases, and there is a reasonable probability

that, but for counsel's ineffectiveness, the result would have been different. *See Hill v. Lockhart,*

474 U.S. 52, 57 (1985).  An ineffective assistance of counsel claim should be denied if the

petitioner fails to make a sufficient showing under either of the *Strickland* prongs. *See*

*Strickland*, 466 U.S. at 697 (courts may consider either prong of the test first and need not

address both prongs if the defendant fails on one).

In this case, Latham's claim fails to meet either of the *Strickland* prongs.  On direct

appeal, appellate counsel joined in Vigil's claim of juror misconduct.  To the extent Latham

argues that counsel's failure to argue that Latham was prejudiced by the misconduct evidences a

deficient performance, such claim must fail because, as discussed above, Latham fails to advance

in his Petition an argument that he was actually prejudiced by the misconduct and thus fails to

show that counsel had a valid basis for making such an argument on direct appeal.  Likewise,

because Latham cannot show that he was prejudiced by the misconduct, Latham fails to establish

that he was subsequently prejudiced by counsel's omission.  Accordingly, Latham's ineffective

assistance of appellate counsel claim must fail.

Evidentiary Hearing

Finally, Latham requests an evidentiary hearing on all claims. However, Latham has failed to specify what evidence he wishes to present for each claim. A district court may not hold an evidentiary hearing on a claim for which a petitioner failed to develop a factual basis in state court unless the petitioner shows that: (1) the claim relies either on (a) a new rule of constitutional law that the Supreme Court has made retroactive to cases on collateral review, or (b) a factual predicate that could not have been previously discovered through the exercise of due diligence, and (2) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable fact finder would have found the petitioner guilty of the underlying offense. 28 U.S.C. § 2254(e)(2).

Where the failure to develop the factual basis for the claim in the state court proceedings is not attributable to the petitioner, to receive an evidentiary hearing, the petitioner must make a colorable claim for relief and meet one of the factors set forth in *Townsend v. Sain*, 372 U.S. 293 (1963). *Insyxiengmay v. Morgan*, 403 F.3d 657, 670-71 (9th Cir. 2005). In *Townsend*, the Supreme Court concluded that a federal habeas petitioner is entitled to an evidentiary hearing on his factual allegations if: (1) the merits of the factual dispute were not resolved in the state hearing; (2) the state factual determination is not fairly supported by the record as a whole; (3) the fact-finding procedure employed by the state court was not adequate to afford a full and fair hearing; (4) there is a substantial allegation of newly discovered evidence; (5) the material facts were not adequately developed at the state-court hearing; or (6) for any reason it appears that the state trier of fact did not afford the habeas applicant a full and fair fact hearing. *Id.* at 670

(quoting *Townsend*, 372 U.S. at 313), *overruled in part by Keeney v. Tamayo-Reyes*, 504 U.S. 1 (1992).

As discussed above, Latham has failed to assert a colorable claim for relief as to any of his claims.  Because Latham does not cite to new laws or underlying facts that were not developed on the record before the state courts with respect to those claims, he has failed to satisfy his burden of proof under 28 U.S.C. § 2254(e)(2).  Accordingly, Latham's request for an evidentiary hearing is denied.

### V. CONCLUSION AND ORDER

Latham is not entitled to relief on any ground raised in his Petition.

**IT IS THEREFORE ORDERED THAT** the Petition under 28 U.S.C. § 2254 for Writ of Habeas Corpus is **DENIED**.

**IT IS FURTHER ORDERED THAT** the requests for a stay and abeyance and evidentiary hearing are **DENIED**.

**IT IS FURTHER ORDERED THAT** the Court declines to issue a Certificate of Appealability.  *See* 28 U.S.C. § 2253(c); *Banks v. Dretke*, 540 U.S. 668, 705 (2004) ("To obtain a certificate of appealability, a prisoner must 'demonstrat[e] that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.'" (quoting *Miller-El*,

537 U.S. at 327)).  Any further request for a Certificate of Appealability must be addressed to the

Ninth Circuit Court of Appeals.  *See* FED. R. APP. P. 22(b); 9TH CIR. R. 22-1.

The Clerk of the Court is to enter judgment accordingly.

Dated: February 20, 2015.

                                                        /s/James K. Singleton, Jr.

                                                     JAMES K. SINGLETON, JR.
                                              Senior United States District Judge